ORDERED in the Southern District of Florida on  06/04/10



Raymond B. Ray, Judge
United States Bankruptcy Court

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
### FT. LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | **CASE NO.: 08-28599-RBR**<br>**CHAPTER 7** |
| **SETH FREEDMAN and LAURA FREEDMAN,** | |
| Debtors. | |
| **PHYLLIS ERSHOWSKY,** | **ADV. PROC. NO.: 09-01382-RBR-A** |
| Plaintiff, | |
| v. | |
| **SETH FREEDMAN,** | |
| Defendant. | |

**FINDINGS OF FACT, CONCLUSONS OF LAW, MEMORANDUM OPINION AND ORDER FINDING IN FAVOR OF PLAINTIFF, PHYLLIS ERSHOWSKY AND AGAINST DEFENDANT SETH FREEDMAN ON ALL COUNTS OF COMPLAINT**

*Case No.: 08-28599-RBR*
*Adv. Proc. No.: 09-01382-RBR-A*

THIS CAUSE came before the Court for trial on March 23, 2010 at 9:30 a.m. on the Complaint for Determination of Dischargeability of Debt Pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (a)(4) (the "Complaint") [D.E. 1] that Plaintiff, Phyllis Ershowsky ("Ershowsky") filed in this case against the Debtor/Defendant, Seth Freedman (the "Debtor" or the "Defendant" or "Freedman"). The Court has considered as evidence in this matter the testimony of Ershowsky both via her written direct testimony and her testimony on the stand; the live testimony of the Debtor on the witness stand[1]; the testimony of witnesses Patrick Nemeth ("Nemeth") and Christine Elzinga ("Elzinga"), which were provided via deposition and which the Court has considered, for the reasons stated below, over the Defendant's *ore tenus* objection at trial; all of the Exhibits the Plaintiff offered into evidence at trial as well as Defendant's Exhibits "I" and "U". The Court has considered the credibility and candor of the witnesses based on the Court's observations in addition to the evidence noted above and is otherwise fully advised in the premises. Based on the Court's findings of fact and conclusion of law as set forth below, the Court finds that the debt that Ershowsky alleged is owed to her by Freedman is excepted from Freedman's discharge pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (a)(4). Accordingly, the Court shall enter a separate final judgment in Ershowsky's favor finding the debt to be excepted from the Debtor's discharge.

## **FINDINGS OF FACT**

The Debtor filed his voluntary Petition under Chapter 7 the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, on December 8, 2008. The Debtor's wife, Laura Freedman, joined in the voluntary Petition, but was not named in this adversary proceeding and no relief is sought against her. The Debtor listed Ershowsky as a creditor on Schedule F.

---

[1] The Defendant's written direct testimony was never filed of record and accordingly the Court did not consider it.

The genesis of the dispute between the parties is as follows. Freedman holds a B.A. from the University of Florida and had, prior to the time period relevant to this case, bought and sold several businesses. In 2002, Freedman bought the assets of a company known as Image Marketing Associates, Inc. from George and Darlene Cecil (the "Cecils"). Image Marketing's business, at that time, was based at an office in Naples; at sometime thereafter, the location was moved to Bonita Springs, Florida, which is also on the west coast of Florida. Freedman paid approximately $1 million for the business. Freedman created a new corporation, Image Marketing Enterprises, Inc. to hold the assets of the business. In order to fund the purchase of the business, Freedman gave the Cecils a purchase money note of an unknown amount and took out a loan through the Small Business Administration ("SBA") for approximately $600,000.00. Freedman personally guaranteed the SBA loan, which was funded through CIT Small Business Lending Corp. ("CIT") and gave a mortgage on his principal residence as additional collateral for the loan. Thus, Freedman had a direct financial stake in the success and/or failure of the business and failure of the business would have resulted in financial ruin to Freedman.

Ershowsky had been an employee with Image Marketing since July of 1993. Ershowsky was the most important employee at Image Marketing in terms of client contact and had fostered many of the client relationships during the time that the Cecils owned the company. In fact, the Cecils thought it so important that Ershowsky stay with Image Marketing after they left that they gave her $20,000.00 on the sale of the business and orally promised her a second $20,000.00 payment if she stayed with the business through the end of 2003. Ershowsky's importance to the business cannot be disputed and Freedman even admitted during his cross examination that she was a very important employee who handled client relations and client services while he lived on the east coast of Florida. However, although Ershowsky handled client relations, she had no

Case No.: 08-28599-RBR
Adv. Proc. No.: 09-01382-RBR-A

access to the books and accounting records of Image Marketing.  Rather, Freedman handled all of Image Marketing's financial decisions.

In 2004 Ershowsky began to consider leaving Image Marketing.  The reasons for leaving included Ershowsky's desire to establish her own independence and build equity in her own business.  Ershowsky felt that she had increased the value of Image Marketing and had even been told on several occasions that clients believed that she was owner of Image Marketing. Ershowsky also believed that starting her own company would allow her to grow as a marketing professional and give her more creative freedom in her employment endeavors.  Ershowsky felt that she was not living up to her creative potential at Image Marketing and felt that, after having essentially run client management at Image Marketing while Freedman was living on the east coast of Florida, that she had the experience and expertise to do a better job on her own and thus, build equity in her own business.  Ershowsky also felt confident that she would succeed in her own business based on the fact that several of the clients had encouraged her to go on her own, at least two of the clients had indicated they would hire her once she was on her own, and she felt the art director at Image Marketing would also leave and join her, thus, giving her the opportunity to state her own business and be successful at it.

Ershowsky then set off on establishing her own business.  Ershowsky testified that her husband owned an office building and she had space available for an office.  Ershowsky even took steps to meet with an attorney to draw up articles of organization for Blue Moon International, LLC and obtain a tax identification from the Internal Revenue Service.

However, prior to leaving Image Marketing, Ershowsky felt it appropriate to inform Freedman and offer to stay at the company long enough to make the transition smooth. Ershowsky felt a sense of loyalty to the Image Marketing based on the fact that she had been

Case No.: 08-28599-RBR
Adv. Proc. No.: 09-01382-RBR-A

there for so long and she informed Freedman that she would stay on for a month after she gave him notice and was happy to train her replacement.

According to Ershowsky, Freedman was surprised and had a very concerned look when she indicated that she wished to leave. Freedman then asked that she give 24 hours to make a proposal for her to remain at Image Marketing and Ershowsky, although she had already made up her mind, agreed to give him the opportunity.

At sometime in August 2004, Freedman and Ershowsky met at a Starbucks on Immokalee Road in Naples, Florida. According to Ershowsky, and confirmed by Freedman, Freedman offered Ershowsky, at that time, an immediate $15,000.00 raise, an annual raise of 10% every year thereafter, some additional perks related to vacation time and working from remote locations and a proposal to share in any profits related to the ultimate sale of the company. Ershowsky testified that Freedman told her at that time that his objective was to grow the business and sell it, and that he planned on selling the business within 4-5 years. Ershowsky was aware that, prior to purchasing Image Marketing, Freedman had bought and sold other businesses and, thus, found the representation to be consistent with Freedman's past business practices.

In addition, Ershowsky testified that Freedman indicated to her that the business was worth approximately $1 million and that, if Ershowsky stayed for 4-5 years, based on Freedman's proposal, she would make $400,000.00 - $500,000.00 on the sale of the business. Ershowsky found the $1 million representation to be realistic based on the fact that she had heard, through discussions with the company's bookkeeper that Freedman had purchased Image Marketing for approximately $1 million. Ershowsky also testified that Freedman did not tell her that the company had any substantial debt. Ershowsky was not aware of the loan that Freedman

had taken out through CIT and the SBA. Although Ershowsky understood that Freedman had paid the Cecils when he bought the business, Ershowsky concluded that Freedman's remaining obligation with the Cecils, if any, had been paid off by or shortly after the one-year anniversary of the sale, which was well before Freedman made Ershowsky the offer to stay. Ershowsky drew this conclusion from the fact that the Cecils asked her to stay for only one year, and when she stayed, the Cecils paid her the additional $20,000.00 that they had previously indicated that they would give her.

In finding that Freedman made the representations set forth above, the Court has considered the conflicting testimony of the witnesses and finds Ershowsky's testimony to be credible. The Court bases this finding on several reasons. First, it is illogical to conclude that Ershowsky would stay at a business where the Defendant offered to share in the profits and not have any inclination of what the business was worth. It simply defies common sense to believe that anyone who was promised a share of the profits of a business when the business was sold would not want even the most basic understanding of the value of the company. Second, Ershowsky's direct testimony and testimony on cross-examination was consistent and detailed. Ershowsky also testified with candor, even admitting that she had not asked any questions about the debts of the company. Conversely, Freedman had inconsistencies in his testimony, could not remember important facts in his deposition, and testified that he misrepresented to Ershowsky at a later date, the need for a new employment agreement when he ultimately sold the company to Crab Key Holdings, LLC. Accordingly, the Court finds Freedman's testimony less than credible and, weighing the evidence accordingly, finds that the representations that Ershowsky alleges were made.

Freedman provided Ershowsky a one-page document that set forth the agreement between Freedman and Ershowsky in regards to the profit sharing. Freedman referred to the profit sharing as a "Phantom Stock Agreement." Ershowsky indicated at this point that she wished to have an attorney draft the agreement and did not believe that the one page document would suffice. Accordingly, Ershowsky retained an attorney for the limited purpose of drafting the agreement that the parties had already reached.

Ershowsky admitted that she did not ask Freedman about the debts of the company. However, Ershowsky had never owned a company, had no idea about how companies are bought and sold, had no idea how purchases of companies are financed, wan not familiar with financing transactions or UCC-1 financing statements, and generally, given her long term status as an employee and lack of management experience, was not familiar with the manner in which business operations are financed. Ershowsky also had no reason to believe that the company had any issues with its finances. Although she was not happy with Freedman's management style with regard to pay raises and holiday bonuses, none of this indicated any financial problems. Freedman however had reason to misrepresent the true value of the company as it related to his agreement with Ershowsky, conceal the debt of the company and not disclose it, given that if Ershowsky left, it was likely that Image Marketing would have failed and Freedman would have been left with his personal guaranty obligation and mortgage against his home.

From the time that Ershowsky and Freedman initially spoke until the Phantom Stock Agreement was finally drafted, approximately six months passed. During this time, Ershowsky received the $15,000.00 raise as Freedman had verbally promised and was provided most of the other "perks" that the parties discussed but were not in writing. Thus, Ershowsky's comfort level with the Phantom Stock Agreement and Freedman's representation about the value of the

company increased as time went on because Freedman fulfilled the other obligations that he had promised her. Ultimately, in late December 2004, the parties reached a final agreement that set forth their position with regard to the Phantom Stock. Freedman even went so far, as to write Ershowsky a letter, which the Plaintiff introduced as Exhibit "5", in which Freedman indicated that the parties had to have "some level of trust" and that there had to be some "give and take" in the agreement. The agreement was ultimately signed and dated January 1, 2005. Ershowsky also signed an employment contract as part of the transaction.

Subsequent to the signing of the Phantom Stock Agreement, the parties' relationship carried on as normal. However, Freedman never notified Ershowsky when he signed a listing agreement to sell the company in June of 2005 notwithstanding that she had an interest in he ultimate sale of the company. Based on the correspondence that was included in the Plaintiff's Exhibits, it appeared that Freedman had been attempting to sell the company for sometime prior to that and that the business broker ultimately requested a written contract in the event a sale was reached.

Sometime in the middle of 2006, Freedman agreed to sell Image Marketing to an entity known as Crab Key Holdings, LLC ("Crab Key"). Patrick Nemeth ("Nemeth") was the principal member of Crab Key. The purchase price that Crab Key paid to Image Marketing was $945,000.00. Prior to the sale to Crab Key, Crab Key's financier required that Ershowsky signed a new employment agreement, Exhibit "15". Ershowsky testified that no one ever approached her about this employment agreement, she had never seen the agreement and she only found out about it after Freedman sold the company. Plaintiff's Exhibit "25", an email from Christine Elzinga ("Elzinga"), and Elzinga's testimony demonstrates that Elzinga emailed the electronic signatures of both Freedman and Ershowsky to Freedman on or about the time that the second

employment agreement (Defendant's Exhibit "I") was allegedly executed. Freedman testified that he gave the employment agreement to Ershowsky two weeks prior because of a bank refinancing and not because he was selling the company. Freedman also testified that Ershowsky gave him authorization to sign the agreement. Ershowsky's testimony that she never signed the agreement and that her electronic signature was forged has added support from Ershowsky's testimony, supported by her Exhibit "21", her office calendar for the week, that she was present in the office and Freedman could have obtained her actual signature if he needed it. It appears that Freedman forged Ershowsky's signature to the agreement because Freedman did not wish to inform Ershowsky of the potential sale and, furthermore, did not believe Ershowsky would sign a new employment agreement given that she had signed one as part of the Phantom Stock Agreement. Ultimately, Crab Key did not require Ershowsky to stay with Image Marketing because the agreement was a forgery.[2] Without Ershowsky obligated to remain with the business, Nemeth testified that he was ultimately only able to sell the business for $250,000.00.

The sale of the company to Crab Key ultimately closed on July 29, 2006. Ershowsky was out of town on the closing date and thus found out via telephone that the company had been sold. This was the first indication that Ershowsky received that was the company was either for sale or in fact had been sold. Ershowsky asked Freedman at that time to tell her how much she would be receiving as a result of her Phantom Stock Agreement and Freedman indicated to her that his accountant was still working on the details. When Ershowsky returned to the office in August, she found on her desk, a redacted copy of the Closing Statement, a redacted version of some additional numbers and a check for $21,956.00. The Closing Statement indicated the persons

---

[2]  Crab Key did however sue Freedman in both state court and this Court and obtained a judgment in this Court, after Freedman did not defend the adversary proceeding, finding Freedman's debt to Crab Key was not discharged in Freedman's bankruptcy.

who has received monies from the sale of the business but did not set forth the amounts.  The only amount that was not redacted was the ultimate proceeds of received after all deductions were paid.  This document was the first time that Ershowsky learned that the Cecils were still owed money from the sale and was the first time that Ershowsky learned that there was a SBA loan that the business paid to CIT.  When Ershowsky asked Freedman for an unredacted version of the document, he refused to provide it to her.  Ultimately, Ershowsky only received the document after she filed suit in the Circuit Court in and for the Twentieth Judicial Circuit, Lee County, Florida and obtained court orders for the documents.  The unredacted version of the Closing Statement showed that the business was sold for $945,000.00, that certain closing costs were paid, that CIT received $537,070.02 as a pay off of the SBA loan and the Cecils received $46,240.00 in final payment of their purchase money loan.  None of these items had ever been disclosed to Ershowsky.  Ershowsky testified that, had she known of the significant debt to CIT and the Cecils, she never would have stayed at Image Marketing because the net value of the company with regard to her interest was significantly less than the $1 million that Freedman had told her.

The only potential indication that there were any liabilities was Freedman's request to include a provision to deduct corporate liabilities in the Phantom Stock Agreement.  However, when Ershowsky asked Freedman why he asked for this language, Freedman's response was that he may borrow money in the future to grow the company or may loan the company money himself, and that he felt that those obligations should be paid first, a point with which Ershowsky agreed.  However, notwithstanding that Ershowsky asked him about the corporate liabilities language, Freedman never indicated that there were existing obligations at the time of the drafting and execution of the Phantom Stock Agreement, omitted the existence of same and

never once represented to Ershowsky that there were already significant liabilities and the true value of the company was significantly less than the $1 million that he had previously stated.

Ershowsky testified that her damages from the misrepresentations were the amounts she would have been paid if the nondisclosed debts were not included in the sale. Accordingly, the Court has applied the formula as set forth in the Phantom Stock Agreement and calculates the damages, based on the amounts that would have been available if the debts had not existed, to be $166,660.00. Additionally, Ershowsky testified that Freedman, who was the only officer and director of Image Marketing, failed to match a portion of her individual retirement account, which totaled $4,445.16, and that Freedman failed to reimburse her expenses totaling $851.96.

## CONCLUSIONS OF LAW

### I.  Evidentiary Rulings

As a preliminary matter, the Court first rules that the depositions of two witnesses that the Plaintiff offered for use at trial are both admissible. On March 16, 2010 the Plaintiff filed with the Court the Depositions of Patrick Nemeth and Christine Elzinga for use at trial. Paragraph 2 of the Court's *Order Setting Trial* set forth a date of March 18, 2010 for parties to object to the use of deposition transcripts. The Defendant did not file or serve an objection and did not raise the issue until the close of evidence. Accordingly, the Court finds that the Defendant waived any objections that might have otherwise been proper.

Even if, however, the Defendant had timely objected, the Court finds use of the depositions proper pursuant to Fed. R.Civ.P. 32. That rule reads:

> (a) Using Depositions.
> *(1) In General.* At a hearing or trial, all or part of a deposition may be used against a party on these conditions:
> (A) the party was present or represented at the taking of the deposition or had reasonable notice of it;

(B) it is used to the extent it would be admissible under the Federal Rules of Evidence if the deponent were present and testifying; and

(C) the use is allowed by Rule 32(a)(2) through (8).

(2) *Impeachment and Other Uses.* Any party may use a deposition to contradict or impeach the testimony given by the deponent as a witness, or for any other purpose allowed by the Federal Rules of Evidence.

(3) *Deposition of Party, Agent, or Designee.* An adverse party may use for any purpose the deposition of a party or anyone who, when deposed, was the party's officer, director, managing agent, or designee under Rule 30(b)(6) or 31(a)(4).

(4) *Unavailable Witness.* A party may use for any purpose the deposition of a witness, whether or not a party, if the court finds:

(A) that the witness is dead;

(B) that the witness is more than 100 miles from the place of hearing or trial or is outside the United States, unless it appears that the witness's absence was procured by the party offering the deposition;

(C) that the witness cannot attend or testify because of age, illness, infirmity, or imprisonment;

(D) that the party offering the deposition could not procure the witness's attendance by subpoena; or

(E) on motion and notice, that exceptional circumstances make it desirable--in the interest of justice and with due regard to the importance of live testimony in open court--to permit the deposition to be used.

(5) *Limitations on Use.*

(A) Deposition Taken on Short Notice. A deposition must not be used against a party who, having received less than 14 days' notice of the deposition, promptly moved for a protective order under Rule 26(c)(1)(B) requesting that it not be taken or be taken at a different time or place--and this motion was still pending when the deposition was taken.

(B) Unavailable Deponent; Party Could Not Obtain an Attorney. A deposition taken without leave of court under the unavailability provision of Rule 30(a)(2)(A)(iii) must not be used against a party who shows that, when served with the notice, it could not, despite diligent efforts, obtain an attorney to represent it at the deposition.

(6) *Using Part of a Deposition.* If a party offers in evidence only part of a deposition, an adverse party may require the offeror to introduce other parts that in fairness should be considered with the part introduced, and any party may itself introduce any other parts.

(7) *Substituting a Party.* Substituting a party under Rule 25 does not affect the right to use a deposition previously taken.

(8) *Deposition Taken in an Earlier Action.* A deposition lawfully taken and, if required, filed in any federal- or state-court action may be used in a later action involving the same subject matter between the same parties, or their representatives or successors in interest, to the same extent as if taken in the later action. A deposition previously taken may also be used as allowed by the Federal Rules of Evidence.

Rule 32 allows the use of transcripts at trial if the party against whom it is offered had the opportunity to cross-examine the witness, the use is authorized under any of the provisions of Rule 32 and that the testimony, if had been given live, was otherwise admissible. *Ueland v. United States*, 291 F.3d 993, 996 (7th Cir. 2002) ("Rule 32(a), as a free-standing exception to the hearsay rule, is one of the 'other rules' to which Fed. R. Evid. 802 refers. Evidence authorized by Rule 32(a) cannot be excluded as hearsay, unless it would be inadmissible even if delivered in court.") (Citations omitted); *Luster v. Ledbetter*, 665 F. Supp. 2d 893, 895-896 (M.D. Ala. 2009) (citing to *Ueland*). Rule 32(a)(4)(B) authorizes the use of depositions if the witnesses are located more than 100 miles from the location of trial. At trial no one disputed that Elzinga, a former employee who lives on the west coast of Florida, or Nemeth, who also lives on the west coast of Florida, were more than 100 miles from trial. A review of the transcripts demonstrates that Freedman was present at the depositions, had the opportunity to cross-examine both witnesses and took advantage of that opportunity. Accordingly, given Freedman's untimely objection and the authorization under the rules for the use of the depositions, the Court has considered the depositions of these two witnesses.

## II.     The Substantive Claims

### A.     Fraud Under 11 U.S.C. § 523(a)(2)(A)

Ershowsky's Complaint contains two counts seeking to have her debt excepted from Freedman's discharge pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (a)(4). The Court will address each section in turn. Section 523(a)(2)(A) reads, in pertinent part:

(a) discharge under Section 727…of this title does not discharge an individual debtor from any debt – (2) for money, property, services or an extension, renewal, refinancing of credit, to the extent obtained by – (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

Section 523(a)(2)(A) has been litigated extensively since its passage and the basic law

regarding the provision is well established.  The Court of Appeals for the Eleventh Circuit has

defined fraud under Section 523(a)(2)(A) as follows:

> Courts have generally interpreted §523(a)(2)(A) to require the traditional elements of common law fraud.  A creditor must prove that: (1) the debtor made a false representation to deceive the creditor, (2) the creditor relied on the misrepresentation, (3) the reliance was justified, and (4) the creditor sustained a loss as a result of the misrepresentation.

*SEC v. Bilzerian*, 153 F. 3d 1278, 1281 (11 Cir. 1998).

Section 523(a)(2)(A) also excepts debts from discharge if the debt is the result of false

pretenses or a false representation.  Courts have defined "false pretenses" as

> [A] series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or false and misleading understanding of a transaction, in which a creditor is wrongfully induced by the debtor to transfer property or extend credit to the debtor….
> A false pretense is usually, but not always, the product of multiple events, acts or representations undertaken by a debtor which purposely create a contrived and misleading understanding of a transaction that, in turn, wrongfully induces the creditor to extend credit to the debtor. A "false pretense" is established or fostered willfully, knowingly and by design; it is not the result of inadvertence.

*Memorial Hospital v. Sarama (In re Sarama)*, 192 B.R. 922, 927-28 (Bankr. N.D. Ill. 1996)

(citations omitted). "What constitutes 'false pretenses' in the context of § 523(a)(2)(A) has been

defined as "implied misrepresentations or conduct intended to create and foster a false

impression." *Id.* at 927 (citations omitted).

It is the burden of the Plaintiff to prove the elements of a Section 523 claim by a

preponderance of the evidence. *Bilzerian*, 153 F. 2d. at 1281. (Citing *Grogan v. Garner*, 498

U.S. 279, 289, 111 S. Ct. 654, 661, 112 L. Ed. 2d 755 (1991)).  In determining whether or not a

plaintiff has proven fraud, the Eleventh Circuit has stated that

> A bankruptcy court may look to the totality of the circumstances, including the recklessness of a debtor's behavior, to infer whether a debtor submitted a statement with intent to deceive. "Reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation may combine to produce the inference [sic] of intent [to deceive]."

*Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 205 (11th Cir. 1994) (citations omitted).  *See*

*also In re Cravey*, 105 B.R. 700, 703 (Bankr. M.D. Fla. 1989) (Proctor, J.) ("The

misrepresentation and nondisclosure of material facts, coupled with their deceptive conduct with

[all parties], establishes the fraudulent intent of the defendants, under the totality of the

circumstances.") (citation omitted).

The Court concludes that Ershowsky has proven by a preponderance of evidence the

required elements to prove her case that the debt from Freedman is nondischargeable.  Based on

the totality of the circumstances, the Court has found that Freedman's representation to

Ershowsky about the value of Image Marketing being $1 million, as well as his failure to inform

Ershowsky that the company had long term debt in the form of the loan Freedman took out to

buy the company from the SBA as well as the remaining payments to the Cecils, were

representations that were false and were made to deceive Ershowsky into remaining with Image

Marketing.  There is ample evidence to reach this conclusion.  First, Freedman was personally

tied to Image Marketing's financial success or failure.  No one disputed that if Ershowsky left,

the company would likely fail or would have been worth significantly less because most of

Image Marketing's clients would have left with her.  Second, Freedman's actions subsequent to

the signing of the Phantom Stock Agreement but prior to the sale to Crab Key demonstrated that

he would take any steps necessary to preserve his stake in the company.  Ershowsky would never

have signed an employment agreement without reviewing it, so Freedman forged her name to tie her to the company and preserve the sale to Crab Key when he knew that Ershowsky would never agree to same. Moreover, even if the Court were to accept Freedman's version of the story, Freedman admitted misrepresenting to Ershowsky the reason for needing the 2006 employment agreement—that it was for a bank refinancing—and never told her the company was about to be sold, thus further demonstrating Freedman's intent in keeping Ershowsky in the dark about the company. Finally, Freedman took steps to cover up the fraud by resisting all of Ershowsky's efforts to uncover the actual results of the sale. Freedman's testimony at trial was of the effect that Ershowsky was not entitled to see the documents. However, this too defies logic. At a minimum, the Phantom Stock Agreement was a contract, and Ershowsky would have been entitled to see the documents underlying her distribution in order to ensure there were no errors in arithmetic. From the totality of these circumstances, the Court concludes that Freedman was intent on keeping Ershowsky at Image Marketing at all costs, and thus the representations made to her were fraudulent.

The Court also concludes that Ershowsky relied on the misrepresentations that Freedman made. The Court has found that Ershowsky was ready to depart Image Marketing and only remained at Image Marketing due to the representations of Freedman regarding the value of the company and that, if she stayed, a resulting sale of the company would result in a nice retirement and "nest egg" for her and her husband. It is illogical to think that Ershowsky would have stayed at Image Marketing for a share of profits if Freedman did not tell her what he thought the value of the company was. It is likewise illogical to conclude that Ershowsky would have stayed if the value was insignificant or, as Ershowsky testified, the value was significantly less than she was told because of the debts against the company. This evidence demonstrates Ershowsky's

reliance on Freedman's representations as to the value of the company.    Accordingly, the first

two elements of a Section 523(a)(2)(A) have been met.

At to the third element, justifiable reliance, the Court finds that Ershowsky's reliance in

this case was justified.  In considering this conclusion, the Court has reviewed the law on what

constitutes justifiable reliance and finds the decisions of the Supreme Court in *Field v. Mans*,

516 U.S. 59, 116 S. Ct. 437, 133 L. Ed. 2d 351 (1995), as well as the Eleventh Circuit's decision

in *In re Vann*, 67 F.3d 277 (11th Cir. 1995) controlling.  In *Field v. Mans* the Supreme Court

determined that justifiable reliance, as opposed to actual reliance or any other form of reliance,

was the appropriate standard to apply to Section 523(a)(2)(A) claims.  The Supreme Court then

went into a lengthy discussion of what constitutes justifiable reliance and even provided certain

examples that the Supreme Court took from the Restatement of Torts as to what constituted

justifiable reliance.  In so, doing, the Court stated as follows:

> the most widely accepted distillation of the common law of torts was the
> Restatement (Second) of Torts (1976), published shortly before Congress passed
> the Act. The section on point dealing with fraudulent misrepresentation states
> that both actual and "justifiable" reliance are required. *Id.*, § 537. The
> Restatement expounds upon justifiable reliance by explaining that a person is
> justified in relying on a representation of fact "although he might have
> ascertained the falsity of the representation had he made an investigation." *Id.*, *§
> 540*. Significantly for our purposes, the illustration is given of a seller of land
> who says it is free of encumbrances; according to the Restatement, a buyer's
> reliance on this factual representation is justifiable, even if he could have
> "walked across the street to the office of the register of deeds in the courthouse"
> and easily have learned of an unsatisfied mortgage. *Id.*, *§ 540, Illustration 1*. The
> point is otherwise made in a later section noting that contributory negligence is
> no bar to recovery because fraudulent misrepresentation is an intentional
> tort…."Although the plaintiff's reliance on the misrepresentation must be
> justifiable . . . this does not mean that his conduct must conform to the standard
> of the reasonable man. Justification is a matter of the qualities and characteristics
> of the particular plaintiff, and the circumstances of the particular case, rather than
> of the application of a community standard of conduct to all cases." *Id.*, § 545A,
> Comment *b*. Justifiability is not without some limits, however. As a comment to
> § 541 explains, a person is

Case No.: 08-28599-RBR
Adv. Proc. No.: 09-01382-RBR-A

"required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation. Thus, if one induces another to buy a horse by representing it to be sound, the purchaser cannot recover even though the horse has but one eye, if the horse is shown to the purchaser before he buys it and the slightest inspection would have disclosed the defect. On the other hand, the rule stated in this Section applies only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his senses. Thus a defect that any experienced horseman would at once recognize at first glance may not be patent to a person who has had no experience with horses." *Id.*, § 541, Comment *a.*

A missing eye in a "sound" horse is one thing; long teeth in a "young" one, perhaps, another.

*Field*, 516 U.S. at 70-71.

The Court also cited other authorities, including Prosser on Torts, with approval:

It is only where that, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something should serve as a warning that he is being deceived that he is required to make an investigation of his own...the matter seems to turn upon an individual standard of the plaintiff's own capacity and the knowledge which he has, which he may fairly be charged against him from facts against his observation and the light of his individual case.

*Field*, 516 U.S. at 71-72 (citations to Prosser omitted). These authorities were the basis for Court's ultimate holding that the justifiable reliance standard is appropriate to Section 523(a)(2)(A) cases. *Field*, 516 U.S. at 74-75 (citation omitted).

Likewise, the Eleventh Circuit in *Vann* expounded on the meaning of justifiable reliance. The *Vann* decision also cited to Prosser & Keeton on Torts for the proposition that justifiable reliance does not require an investigation if the victim of the fraud does not have knowledge of circumstances that would alert her to the fraud:

To constitute justifiable reliance, "the plaintiff's conduct must not be so utterly unreasonable, in the light of the information apparent to him, that the law may properly say that his loss is his own responsibility." This conclusion, however, does not mean that the reliance must be objectively reasonable. . . . Justifiable reliance is gauged by "an *individual standard* of the plaintiff's own capacity and

the knowledge which he has, or which may fairly be charged against him from the facts within his observation in the light of his individual case." . . .**[I]t is only where, under the circumstances, the facts should be apparent to one of [plaintiff's] knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own.**

*Vann*, 67 F.3d at 286 (bold added) (italics in original) (Citation to Keeton & Prosser omitted).

The *Vann* decision also cited to *Meyer v. Spanel Intl.*, 51 F.3d 670 (7th Cir. 1995) in which Judge Easterbrook stated in the opening paragraph that "Debts attributable to fraud may not be discharged, 11 U.S.C. § 523(a)(2)(A), and intentional deceit concerning a material proposition is fraud whether or not a more-alert target would have smelled a rat. Victims of intentional torts need not take special precautions." *Id.* The court then concluded, in the portion of the case that the *Vann* decision cited with approval, that

> A victim who lacks access to the truth, and has not been alerted to facts that would alert him to the truth, is not to be denied recovery under the securities laws--or be blocked by a discharge under the bankruptcy laws--just because he did not conduct a more thorough investigation.

*Meyer*, 51 F.3d at 676.

Based on the reasoning set forth in *Field* and *Vann*, as well as the examples provided therein, the Court concludes that Ershowsky justifiably relied on the representations that Freedman made to her. The Court recognizes that, at trial, the Court indicated concern with the fact that Ershowsky did not ask for any documentation regarding the finances of Image Marketing. However, based on the case law interpreting justifiable reliance, the Court concludes that Ershowsky was under no duty to ask and had no reason until after the sale to Crab Key to doubt Freedman's representations, and that she fulfilled any obligations regarding the corporate liabilities language when she asked Freedman for an explanation of why he wanted that language and received a justifiable and logical response.

Moreover, nothing in the evidence presented would have given Ershowsky any indication that something was amiss. Accordingly, Ershowsky was not required to undertake any investigation. Rather, Ershowsky's testimony supported her conclusion that Freedman's value was accurate, and her testimony that she believed the Cecils had been paid supports further the conclusion that she was not required to do any investigation. In concluding that Ershowsky justifiably relied on the representations, the Court has also considered Ershowsky's lack of prior business experience when the representations were made, taken in contrast with Freedman's extensive business experience, as well as the fact that Freedman made several promises to Ershowsky, including the immediate raise and the subsequent annual raises, and performed all of them. When Ershowsky did ask about the net liabilities language in the agreement, Freedman did not tell her that there were existing liabilities; rather, he stated that he might incur debt in the future and wanted to be able to account for it prior to paying Ershowsky. This representation was just as inaccurate and misleading as the previous statements Freedman had made.

Ershowsky testified that she had never been more than an employee at any business, had never owned a business, had no idea how businesses were financed, had no idea what a UCC-1 Financing Statement was, and generally had no experience in business valuation or determining what a business was really worth. Moreover, Ershowsky had no duty to search public records in order to determine whether any debts existed; in *Field* the Supreme Court noted with approval the example of justifiable reliance set forth in Prosser that a representation that a property was free and clear of mortgages when a trip to the county recording office would have proven otherwise was nonetheless sufficient to constitute justifiable reliance. Thus, even assuming Freedman's representations that UCC-1 Statements were filed and available in a public records search (the Court notes that none were put into evidence) is accurate, Ershowsky was not

Case No.: 08-28599-RBR
Adv. Proc. No.: 09-01382-RBR-A

required to look for them. The standard of justifiable reliance as set forth in *Field* only requires that Ershowsky investigate if she was aware of any facts that would have made the representations false from a cursory glance, or that she had previously discovered something that would have otherwise demonstrated the falsity of the statements. There was nothing in evidence to demonstrate that Ershowsky had any previous knowledge prior to the representations that Freedman had borrowed money to buy the business or that the company had any sort of long-term debt. The only information that Ershowsky had regarding potential long term debt was the fact that the previous owners, the Cecils, had asked her to remain at the company for an extra year and had given her an additional $20,000.00 when she had done so. This evidence demonstrates that Ershowsky believed that there was no long-term debt because she assumed that, had the Cecils still been owed money, they would have asked her to stay longer. Simply put, there was nothing, from a justifiable reliance standpoint that would have put Ershowsky on notice given her prior business background and her prior dealings with Freedman that would have required her to do any further investigation, and her reliance on the representations as to the value of the business was justified under the circumstances.

Finally, Ershowsky has proven that she was damaged by the representation. Ershowsky stayed at Image Marketing based on the $1 million value. Had Freedman's representations been accurate and had there been no long term debt against the company, then at closing, the company would have received, after deducting the costs of the sale, including the broker's commission and other costs that were incurred, a total of $848,392.52. After deducting the corporate liabilities post closing of $118,335.00, the net profit on the sale would $660,083.52. Applying the phantom stock formula as set forth in Exhibit "10", using the gross profit number of $660,083.52, there were 1,400 shares of stock, including the 1,000 shares of common stock and

400 shares of Phantom Stock to Ershowsky.    Accordingly, each share of stock was worth $471.49.    Accordingly, Ershowsky's distribution should have been $188,596.00.    Ershowsky received a total of $21,936.00, leaving an amount due of $166,660.00.    In addition, the Court concludes that Freedman is liable for the $851.96 for failure to reimburse Ershowsky for expenses. The Court concludes these amounts to be the damages due to Ershowsky pursuant to Section 523(a)(2)(A).

## II.  Fraud Pursuant to 11 U.S.C. § 523(a)(4)

Ershowsky's second claim against Fredman was brought pursuant to 11 U.S.C. § 523(a)(4). That section states that debts that are a result of "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny" are not subject to discharge.  The basis of this claim is that Freedman committed fraud or a defalcation while acting as a fiduciary when he failed to make Ershowsky's matching contribution to her simple IRA.  The Court concluded that Ershowsky is entitled to judgment on this claim as well.

The seminal case in the Eleventh Circuit on Section 523(a)(4) is *Quaif v. Johnson (In re Johnson)*, 4. F.3d 950 (11th Cir. 1993).  *Quaif* defined "defalcation" for bankruptcy purposes as "[A] failure to produce funds entrusted to a fiduciary." *Id.* at 955 (citations omitted).  There is no dispute that Freedman failed to produce the funds in question to Ershowsky.  Thus, whether or not the debt is nondischargeable turns on the question of Freedman's status as a fiduciary under Section 523(a)(4).

In *Quaif*, the Eleventh Circuit defined "fiduciary" for dischargeability purposes as requiring the existence of and express or technical trust, and included statutorily created trusts if they were somehow segregated from other amounts.  *Quaif*, 4 F.3d at 953-54.  Courts have found that the existence of a retirement plan can constitute a fiduciary duty if the plan has an identifiable *res,*

beneficiaries and trust duties established by contract or statute. *See In re Goodwin*, 355 B.R. 337, 344 (Bankr. M.D. Fla. 2006) (Jenneman, J.).

Ershowsky's undisputed testimony was that an agreement existed for Image Marketing to match employee contributions to the employees' IRA accounts for those who participated. Freedman was the only officer and director of Image Marketing, so he was the person solely responsible for payments to the IRA accounts, as well as all of Image Marketing's financial decisions. Officers of corporations can be deemed fiduciaries for purposes of ERISA-legislated retirement plans if they exercise appropriate control over plan assets. *See generally LoPresti v. Terwilliger*, 126 F.3d 34 (2nd Cir. 1997) (finding one brother, who was only officer and shareholder of corporation along with other brother, personally liable as fiduciary under ERISA because brother essentially controlled where company funds, including amounts due to plan, funds would be paid, for amounts due to plan but finding second brother not liable because he did not have any say in company finances); *Goodwin,* 355 B.R. at 344 ("An individual also can be deemed a fiduciary if they have any discretionary authority or responsibility with respect to the administration of the plan.") (Citation omitted). Moreover, the fiduciary duties under ERISA have been found to be sufficient to constitute a fiduciary for purposes of Section 523(a)(4). *See e.g. Goodwin*, 355 B.R. at 344 (Finding fiduciary duty existed for purposes of Section 523(a)(4) as "[T]he *res* is the plan itself . . . the beneficiaries are the plan participants, and the defendant's fiduciary duties arose when the plan was created, prior to any individual debt to a specific beneficiary.")

Accordingly, because Freedman was solely responsible for making Image Marketing's payments to the employees' plans, Freedman is a fiduciary for purposes of Image Marketing's agreement to contribute to Ershowsky's IRA. Freedman did not dispute the failure to account for

the unpaid funds.  Therefore, Ershowsky's debt to Freedman for failing to match the $4,415.16 is nondischargeable pursuant to 11 U.S.C. § 523(a)(4).

## CONCLUSION

The foregoing constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52, made applicable to adversary proceedings pursuant to Bankr.R. 7052.  For the reasons stated herein, the Court finds that Ershowsky is entitled to judgment on all counts of her Complaint against Freedman.  The Court shall issue a separate Final Judgment in accordance with this Memorandum Opinion and Order.

# # #

Copies to:

Robert F. Reynolds, Esq., Counsel for Plaintiff

Seth Freedman, *pro se*